Stanley Turzynski v. Commissioner.
Turzynski v. Comm'r
Docket Nos. 1607-66 and 618-69.
United States Tax Court
T.C. Memo 1972-136; 1972 Tax Ct. Memo LEXIS 121; 31 T.C.M. (CCH) 617; T.C.M. (RIA) 72136; June 26, 1972, Filed Tried Joseph M. Solon, 208 LaSalle St., Chicago, Ill., for the petitioner. William L. Ringuette and Charles B. Wolfe, Jr., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes for the calendar years 1959, 1960, 1961, and 1962 in the amounts of $11,093.93, $10,389.09, *121 $82,862.48, and $79,435.67, respectively, and 618 additions to tax under section 6653(b), I.R.C. 1954, [1] for these years in the amounts of $5,546.96, $5,194.55, $41,431.24, and $40,162.21 [sic], respectively. The issues for decision are: *122 (1) Whether petitioner understated his income for the years 1959 through 1962, and if so, whether a part of the underpayment resulting from the understatement was due to fraud with intent to evade tax. (2) Whether the use by respondent of increases in petitioner's net worth plus nondeductible expenditures in determining petitioner's income for each of the years here in issue was proper, and if so, whether respondent properly determined the amount of cash petitioner had at the beginning of each of the years here in issue and made a proper adjustment for depreciation on certain buildings owned by petitioner. (3) Whether petitioner is collaterally estopped to deny that a portion of the underpayment of his tax for the calendar years 1959 and 1960 was due to fraud with intent to evade tax by his conviction in the United States District Court for the *123 Northern District of Illinois, Eastern Division, of violating the provisions of section 7201, I.R.C. 1954, for each of these years. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, an individual who resided in Chicago, Illinois at the time of the filing of his petitions in this case, filed Federal income tax returns for the calendar years 1959, 1960, 1961, and 1962 with the district director of internal revenue at Chicago, Illinois. Petitioner was born in Lwow [Lemberg] Poland on January 22, 1919. He attended elementary and high schools at Warsaw, Poland, and from 1936 to 1939 he attended Lemberg University in Lemberg, Poland. In 1939 petitioner was a member of the Polish armed forces. He was captured by the Germans. Later he escaped from the prisoner of war camp. Thereafter, he was apprehended by the Nazis, survived a Nazi firing squad, and later was again arrested and placed in a Nazi Concentration Camp, where he remained until April of 1945 when he obtained his freedom. In April 1945 petitioner went to Cham, Bavaria and worked for the United States Army at an evacuation field hospital for displaced *124 persons until September 1945. In September 1945 he became a medical student at the University of Erlangen, Erlangen, Germany and received his medical degree from that university on October 20, 1947. He continued to attend the University of Erlangen thereafter until some time in 1949 and from June 16, 1949, to January 1950, he served as a physician specializing in electrocardiograph diagnosis with the 2951st Polish Labor Service Company, American Graves Registration Command in Paris, France. In January 1950 petitioner returned to the University of Erlangen as a student and he remained at the university until January of 1951. On January 25, 1951, petitioner entered the United States via New York, New York, aboard the U.S.N.S. General W.C. Langfill. The Polish Immigration Committee and the National Catholic Welfare Agency sponsored him as an immigrant to this country. As a prerequisite to obtaining a license to practice medicine in the United States, petitioner was required to serve an internship at an American hospital. During the months of February and March of 1951, petitioner served at St. Vincent's Obstetric Hospital in Philadelphia, Pennsylvania where he received no compensation. *125 In May of 1951 he served at All Souls Hospital, Morristown, New Jersey, for a total compensation of $70, and in June 1951, he served at Swedish Hospital in Brooklyn, New York at a total compensation of $200. For a 2-week period during July 1951 he served at Morristown Memorial Hospital, Morristown, New Jersey, for a total compensation of $75, and for the other 2 weeks in July 1951, he served at Mary Immaculate Hospital in Jamaica, New York for a total compensation of $75. For the period August 1951 through January 1953 petitioner served an internship and residency at Cumberland Hospital (City Hospital) in Brooklyn, New York and received total compensation during this period of $1,374.92. During November and December 1953, he served at Haim Solomon Hospital, New York for total compensation of $654, and during October and November 1954, he served at Rockaway Beach Hospital, Long Island, New York for total compensation of $501.70. 619 In late 1954 petitioner took and successfully passed the Illinois State Board examination for physicians, and on December 10, 1954, he became a licensed physician in the State of Illinois. In January of 1955 petitioner began the practice of medicine *126 in Chicago, Illinois. In 1955 petitioner received $1,620 from Cook County for working at Oak Forest Hospital. On his Federal income tax return for the calendar year 1955 petitioner reported this receipt of $1,620 and showed a loss "from business" of $1,235, dividend income of $800 less a $50 exclusion leaving a remainder of $750, and interest income of $130, leaving an adjusted gross income of $1,275. [2]
During 1956 petitioner was employed by the City of Chicago Municipal Tuberculosis Sanitarium and received a salary from this employment of $5,185. On his Federal income tax return for the calendar year petitioner reported this $5,185 as salary. He reported a loss from business as shown on a separate schedule C of $2,272. On his separate schedule C petitioner showed his principal business activity as physician and his business address as 7550 South Halsted Street, Chicago, Illinois. He showed total receipts of $3,100 and business expenses of $5,372, thus arriving at the loss reported. On this return petitioner reported other income of $1,301, thus arriving at adjusted *127 gross income of $4,214. On about July 24, 1957, petitioner purchased premises located at 5625 South Pulaski Road, Chicago, Illinois and in the fall of 1957 set up a private practice of medicine at this location. Petitioner paid $36,000 for this property and made improvements thereto in the amount of $900. On his Federal income tax return for the calendar year 1957 petitioner reported salary of $6,798 from the City of Chicago Municipal Tuberculosis Sanitarium, and a loss of $4,361 from his business as reported on schedule C. On schedule C he showed his principal business activity as physician and his business address as 5625 South Pulaski Road, Chicago, Illinois. He reported total receipts of $4,350, expenses of $8,711 with the resultant loss as reported on his return. He reported other income of $1,639 which was shown to consist of dividends of $1,335 less the $50 exclusion or a net of $1,285, and interest income of $354. Based on these figures, he reported an adjusted gross income of $4,076.01. On his Federal income tax return for the calendar year 1958 petitioner reported a profit from business of $955 and other income of $2,450. On schedule C attached to the return petitioner, *128 in arriving at the $955 profit, showed that his principal business activity was physician and the location of his business was 5625 South Pulaski Road, Chicago, Illinois. He showed total receipts of $13,450, less deductions of $12,495. Included in the deductions claimed were interest on business indebtedness of $1,250, taxes on business and business property of $480, and depreciation of $2,995. The other income reported by petitioner on his 1958 return consisted of net devidends of $1,670, computed by subtracting the $50 exclusion from dividends of $1,720, and interest of $780. For the calendar year 1959 petitioner filed a Federal income tax return reporting a loss of $393.26 from business as shown on schedule C, other income of $3,884 with a resultant adjusted gross income of $3,490.74. On schedule C petitioner showed his business activity as physician and the Pulaski Road address shown on the 1958 return. He reported gross receipts of $11,208 and expenses of $11,601.26. Included in the expenses reported were interest on business indebtedness of $848.53, taxes on business and business property of $455.48, depreciation of $2,710.55 which included depreciation on building of $739.80 *129 and other business expenses of $7,586.70. The other business expenses as itemized were for cleaning of business property, laundry, office supplies, medication, car maintenance and repair, licenses and insurance, malpractice and public liability insurance, membership dues, Christmas gifts to hospital employees, telephone, gas, and electricity. The other income was not itemized except that under dividends received credit appeared in the amount of $2,322 with a tentative credit at 4 percent of $92.88 shown. On a retained copy of his income tax return for the calendar year 1959 petitioner showed the balance of other income to consist of $1,562 of interest. Attached to the retained copy were four sheets of accounting paper with each day in the year beginning with January 1 and running through to December 31 listed thereon, and a figure amount inserted under the heading of each day. Occasionally there would be two figures instead of one and then a total would be shown. 620 For the calendar year 1960 petitioner reported on his Federal income tax return a business loss of $1,369.80, other income of $2,749.02 and adjusted gross income of $1,379.22. On schedule D, "Gains and Losses from *130 Sales or Exchanges of Property," petitioner reported two sales, each of 100 shares of General Dynamics stock, during the year, one at a loss of $957.06, and the other at a loss of $1,004.92, making a total capital loss of $1,961.98. The $2,749.02 of other income reported by petitioner was arrived at by adding $2,817 of net dividends after subtracting the $50 dividend exclusion to $1,894 of interest and subtracting from this total the $1,961.98 loss. On schedule C, petitioner showed total receipts of $9,234 and total expenses of $10,603.80 Included in the expenses were interest on business indebtedness of $691.35, taxes on business and business property of $457.90, depreciation of $2,441.05 which amount included $789.80 depreciation on building, and other expenses of $7,013.50. The other business expenses consisted of the same items as shown for other business expenses on the 1959 return. On August 19, 1961, petitioner purchased a medical practice known as the Garfield Ridge Medical Center at 6165 South Archer Avenue, Chicago, Illinois, from a doctor by the name of Samuel A. Libert (hereinafter referred to as Libert). The purchase was made pursuant to an agreement entered into between *131 Libert and petitioner on May 4, 1961. This agreement provided that petitioner would pay to Libert $185,000 for Libert's interest in the real estate located at 6165 South Archer Avenue and medical practice. The agreement specifically provided that the medical practice which was being sold should include all the "medical diagnostic equipment, office and waiting room furniture, equipment and machinery, all of the inventory of drugs, and medical supplies * * * together with all accounts receivable standing on the books of the Seller as of the date of the closing of said real estate deal." A list of the equipment, furniture, machinery, drugs and supplies was attached to the agreement as exhibit "A". The agreement also provided that on all medical fees which were received by the buyer under the agreement transferring the accounts receivable for which the seller was obligated to medical consultants, the buyer, upon receipt of the medical payment, would pay the consultant's fee. An exhibit "B" was attached to the agreement listing the names of the consultants which appeared on the seller's records with respect to which the buyer could become obligated to pay the consultant fee upon receipt *132 of the medical fee payment. The agreement contained a provision that the seller would use his best efforts to effect a smooth transfer of the medical practice to the buyer and would remain in the employ of the buyer until December 1, 1961, for the purpose of effecting the transfer and of rendering any and all necessary services as a medical doctor and administrator that he ordinarily rendered when he was the owner of the medical practice, and in consideration would receive a weekly salary of $300. The agreement provided that as further consideration of the sale, the seller agreed not to practice his profession as a general practitioner or open a new office for the general practice of medicine directly or indirectly, after the closing date of the sale, within a radius of 15 miles of 6165 South Archer Avenue except that the downtown area of the city of Chicago, River Forest, and Oak Park, Illinois were excluded from the restrictive convenant. The agreement further provided that the buyer should have the exclusive use of the trade name known as Garfield Ridge Medical Center. After August 19, 1961, petitioner conducted to major portion of his medical practice from 6165 South Archer Avenue, *133 although he still retained his office and did some practice at 5625 South Pulaski Road. Shortiy after August 19, 1961, Libert became ill. He worked a number of days for petitioner at the Garfield Ridge Medical Center between the date of the sale of the Center to petitioner on August 19, 1961, and December 1, 1961. On December 1, 1961, a document entitled, "Amendment to the Memorandum of Agreement of May 4, 1961," was signed by petitioner and Libert. This document provided that petitioner and Libert agreed to cancel and set aside the condition of the May 4, 1961 agreement restricting Libert from the practice of medicine within 15 miles of 6165 South Archer Avenue, provided Libert remained employed by petitioner for an additional 3 months beyond December 1, 1961. Libert did continue to work certain days for petitioner, the last date on which he worked for petitioner at the Garfield Ridge Medical Center being in the latter part of April 1962. 621 During the year 1960 Libert had gross receipts from the Garfield Ridge Medical Center of approximately $145,000. From time to time other doctors were employed at the Garfield Ridge Medical Center and there were clerical and assisting *134 personnel employed there. Petitioner on his Federal income tax return for the calendar year 1961 reported a business loss, as shown on schedule C, of $937.57 from the Garfield Ridge Medical Center, and on a separate schedule C showed a business loss of $995.55 from the Pulaski Road address. On both of these schedules C, the principal business activity was shown as physician and the principal product or service as medicine. On the schedule C for the Garfield Ridge Medical Center, he showed receipts as $18,050, and total expenses of $18,987.57. The expenses shown consisted of salaries and wages of $7,715.07, depreciation of $687.52, and other business expenses of $10,584.98. The depreciation was shown as being on medical building acquired August 19, 1961, at a cost of $40,000 with a total depreciation of $500 and on equipment acquired August 19, 1961, at a cost of $5,000 with a total depreciation of $187.52. Other expenses listed consisted of insurance, cleaning service, consultant fees, drugs and supplies, general expenses, lab fees, utilities, patient rebates, and telephone. On the schedule C for the South Pulaski Road location petitioner showed total receipts of $5,475 and total *135 expenses of $6,470.55, consisting of depreciation of $2,088.55 which included depreciation on building of $739.80 with a notation "90 percent for business - 10 percent for personal use," and depreciation of $1,050 on an automobile stated to have been acquired on March 1, 1959, for $4,200 with a notation "Trades car every three years - 1 year set up as salvage value." The other expenses listed were for laundry, office supplies, drugs and medicines, car license and insurance, malpractice and other insurance, professional dues, and utilities. On schedule D petitioner showed a "Carry Forward Loss from Year 1960" of $961.98 which was carried forward as a loss on the first sheet of the return. Petitioner on this return showed other income of $6,745.54 which consisted of dividend income of $5,495.54 less a $50 dividend credit, leaving reportable dividends of $5,445.54, and interest from General Savings and Loan of $450, Trident Savings and Loan of $425, and Crawford Savings and Loan of $425, making total interest of $1,300. Petitioner on his 1962 Federal income tax return reported income of $1,958.09 from the business of the Garfield Ridge Medical Center as shown on schedule C and a business *136 loss of $1,557.50 from his medical practice at the South Pulaski Road office. The income from the Garfield Ridge Medical Center, as reported on schedule C, showed gross receipts of $69,400.25 less patient rebates of $350, leaving total gross receipts of $69,050.25. The expenses deducted from receipts to arrive at gross profit were shown as merchandise purchased of $17,676, cost of labor "consulting fees to doctors" of $8,040, office supplies of $314.73, outside labor of $900, making a total of $26,930.73 from which was subtracted an amount of $1,121.75 designated as "Inventory at the end of this year," leaving an amount of $25,808.98, which was subtracted from gross receipts of $69,050.25 to arrive at the gross profit of $43,241.27. From this gross profit petitioner subtracted $41,283.18 for other business deductions which consisted of depreciation of $5,450, taxes on business and business property of $2,058.57, repairs to typewriter, air conditioning and plumbing of $275, salaries and wages of $15,871.67, insurance of $1,362, laboratory fees of $1,500, professional dues of $210, interest on business indebtedness to Talman Federal Savings and Loan Association of $2,658.41, and other *137 business expenses of $11,897.53. The depreciation shown was based on $4,950 depreciation on Medical Center Building listed at a cost of $165,000 and as acquired on August 19, 1961, with allowable depreciation in prior years shown as $500, and depreciation on medical equipment, listed as acquired at a cost of $5,000 on August 19, 1961, with depreciation previously allowable as $187.52, and depreciation in the current year shown as $500. Above the listing of the building was shown land acquired August 19, 1961, at a cost of $15,000 with no depreciation shown. Included in the $11,897.53 of other expenses were social security taxes, unemployment compensation insurance tax, excise taxes, interest on delinquent social security tax, water taxes, real estate taxes, cleaning services of $2,835, light, gas heat, and telephone shown to be $4,400, laundry of $364, advertising of $250, car licenses and insurance of $256.50, gas, oil, and repairs to automobile of $1,580.75, malpractice insurance of $90, parking $485, postage $340, fuel oil $700, and Christmas expenses $780. On the schedule C with respect to the South Pulaski Road address, petitioner showed for the year 1962 gross receipts of *138 622 $1,900 less merchandise purchased of $275.18, leaving a gross profit of $1,624.82. He showed expenses of $3,182.32 consisting of depreciation of $2,192.55, insurance of $80, and other business expenses of $909.77. Included in the depreciation was $739.80 depreciation on the building stated to represent "90 percent for business 10 percent for personal use," and depreciation of $1,260 on an automobile shown to be a Cadillac purchased on April 1, 1961, for $5,600. There was a notation to the claimed depreciation on the automobile, "Trades car every 3 years. 1 year set up as salvage value." The other expenses of $909.77 consisted of laundry, office supplies, water taxes, gas heat, telephone and lights. On this return petitioner showed dividends received of $6,945.68 less the $50 dividend credit with a remainder of $6,895.68 of taxable dividends and interest income of $1,525 consisting of $425 interest from Trident Savings and Loan, $450 from General Savings and Loan Association, $425 from Crawford Savings and Loan Association, and $225 from Talman Federal Savings and Loan Association. Other than the accounting paper attached to his 1959 retained copy of his return and some few *139 entries on certain of his patient record cards, petitioner had no record of receipts from his Pulaski Road office medical practice for the years 1959, 1960, 1961, and 1962. Other than certain check stubs and miscellaneous memoranda he had no record of expenses of his medical practice on South Pulaski Road for the years 1959, 1960, 1961, and 1962. The records kept for the years 1961 and 1962 at the Garfield Ridge Medical Center could not be reconciled with the income and expenses reported on petitioner's income tax returns for the years 1961 and 1962. There were from 5,000 to 10,000 patient record cards at the Garfield Ridge Medical Center. Petitioner kept some form of appointment book during 1961 and 1962. Circularizing some of the patients shown on petitioner's patient record cards at the Pulaski Road office disclosed that petitioner's receipts from medical fees in 1959 were in excess of $21,775.30 and his receipts for medical services in 1960 were in excess of $19,757.25, and in 1961 were more than $2,000 over the $5,475 reported by petitioner as medical receipts at the South Pulaski Road office for 1961. Many less patients were circularized with respect to the year 1961 than *140 with respect to the years 1959 and 1960. No patients were circularized with respect to the year 1962. No patients listed on the patient cards of the Garfield Ridge Medical Center were circularized with respect to any year. When petitioner purchased the Garfield Ridge Medical Center, there were between 30 and 45 patients a day treated at that office. After Libert left the Center in April 1962, the number of patients treated at the Center declined. When petitioner began operating the Center in 1961, he began to keep on loose leaf sheets of notebook paper, daily records of some of the fees paid by patients at the Center and some of the fees received by mail. Some of the notations on this record were made by petitioner personally and were in his handwriting and others were made by employees at the Garfield Ridge Medical Center. Usually, the number of names and payments listed would run from three to five or six a day. Although there were some days when only one patient's name was listed and some days when there would be a listing of as many as 20 names, on many of the days shown in these papers, only two names were listed. Under date of August 26, 1961, there was a listing of "Santa *141 Fe re physical July 1961 Mail $15." The word "mail" was written in red ink. There were other similar listings, not only of Santa Fe, but of other corporate names. These listings apparently referred to medical services rendered to employees of corporations who sent their employees to the Medical Center for treatment. There were notations of names of several different insurance companies followed by "re" with a patient's name. Under date of August 31, 1961, there was listed a patient's name, then in parenthesis "Patient paid" and an amount of $125. Other notations similar to this were shown next to each patient's name. The amounts shown next to each patient's name ran from as little as $3 to a high of $1,250.80. There were a number of listings on these loose leaf sheets during the years 1961 and 1962 designated as "Santa Fe" or "SFFR", one such listing under date of November 11, 1962, read as follows: "SFFR May, June and July 1962 $1,792.75." Throughout the 2 years, there were similar listings of names of other corporations with amounts shown. The total amount shown on these sheets of note paper for the year 1961 was 623 less than the amount reported on petitioner's income tax *142 return as received from the Garfield Ridge Medical Center and the total amount shown on these loose leaf sheets for the year 1962 was less than the total amount shown on petitioner's income tax return for the year 1962 as received from the Garfield Ridge Medical Center. During the year 1959 petitioner received total interest income of $2,048.04 from the payers and in the amounts as follows: Payer
Amount
General Federal
$ 400.00
Talman Federal
350.44
Crawford Savings
400.00
Lawn Savings (Acct. X7586)
400.00
Republic Savings
389.98
Trident Savings 107.62
Total $2,048.04 During the year 1960, petitioner received interest income in a total amount of $2,883.24 from the payers and in the amounts as follows: Payer
Amount
New Park Hospital
$ 20.99
General Federal (Acct. XXXX)
450.00
General Federal (Acct. X5556)
450.00
Talman Federal
228.28
Crawford Savings
450.00
Lawn Savings (Acct. X5589)
225.00
Republic Savings
212.50
Trident Savings
413.64
Hemlock Federal 432.83
Total $2,883.24 During the year 1961 petitioner received interest income in the total amount of $2,655.02. This amount included the amounts totaling *143 $1,300 reported on his income tax return as having been received from General Savings and Loan, Trident Savings and Loan, and Crawford Savings and Loan, plus $25 additional interest received from each Trident Savings and Loan and Crawford Savings and Loan. The remaining $1,305.02 was received from the payers and in the amounts as follows: Payer
Amount
New Park Hospital
$ 60.00
General Federal (Acct. 15556)
225.00
Talman Federal
276.25
Lawn Savings (Acct. X5589)
292.50
Hemlock Federal
292.50
Lawn Manor (Acct. 22207) 158.77
Total $1,305.02 During the year 1962 petitioner received interest income in the total amount of $2,272.25. In addition to the $1,525 [3] petitioner reported on his income tax return as having been received from Trident Savings and Loan, General Federal, Crawford Savings, and Talman Federal, he received interest in the following amounts from the payers as indicated: *144 Payer
Amount
New Park Hospital
$ 60.00
Lawn Savings (Acct. 45589)
159.38
Hemlock Federal
256.87
Lawn Manor Savings (Acct. 22207)
$300.25
In 1960 petitioner had a capital gain of $79.50 from the sale on August 11, 1960, of 100 shares of Reynolds Metals stock, and in 1961 he had capital gains in the amounts of $21.36, $16.14, and $2,171.25 from the sale of 100 shares of Schick, Inc. stock on May 23, 1961, 100 shares of Unexcelled Chemical stock on June 6, 1961, and 100 shares of American Viscose stock on June 9, 1961, respectively. During 1961 petitioner received rental income of $1,540 from the rental of office space to an optometrist and a dentist in the Garfield Ridge Medical Center building. In 1962 petitioner received total rental income of $3,870 from the rental of this office space in the Garfield Ridge Medical Center to the same optometrist and dentist. On May 7, 1951, petitioner opened a savings account at the Manufacturers Trust Company in New York with a deposit of $800. Thereafter on May 9, 1951, he withdrew $15. No further withdrawals were made from this account until March 5, 1952, when the account was closed out and at that time, because *145 of deposits in varying amounts, one of which was $15, two of which were $100, and the balance in excess of $100 with the largest one amount being $1,350 on March 4, 1952 and the addition of certain amounts of interest, the total amount in the savings account was $4,003.31. On March 6, 1952, petitioner opened a savings account in the Dime Savings Bank in Brooklyn by depositing the $4,003.31 which he had withdrawn in closing his account at the Manufacturers Trust Company. A number of deposits were thereafter made to this account, the largest one deposit being in the amount of $1,000.30 and four other deposits being in an amount in excess of $950. Only two small 624 withdrawals were made from this account, the total of the two being less than $100 until February 3, 1953, when $1,000 was withdrawn. There was another withdrawal of $1,000 on February 11, 1953, and $550 was withdrawn on April 14, 1953. A $300 withdrawal was made on April 30, 1953, a $750 withdrawal on November 17, 1954, and three other withdrawals between July 2, 1953, and July 6, 1954, of $50 or less. On January 7, 1955, this account was closed by the withdrawal therefrom of $7,063.94. From this withdrawal petitioner *146 deposited $6,563.94 in savings account No. XXXX which he opened on January 10, 1955, at the General Savings and Loan Association of Chicago. On January 5, 1955, petitioner opened a checking account at the Exchange National Bank of Chicago, Illinois which he maintained from that time throughout the years in issue. On or about April 7, 1961, petitioner opened a checking account under the title, "Stanley Turzynski, M. D." at the Drovers National Bank of Chicago. He maintained this checking account throughout the years here in issue. On or about August 24, 1961, petitioner opened a checking account under the name of Garfield Ridge Medical Center at the Drovers National Bank of Chicago. He maintained this account throughout the years here in issue. Starting with the opening of a savings account on January 10, 1955, at General Savings and Loan Association, petitioner thereafter opened a number of other savings accounts, the ones at Talman Federal Savings and Loan Association of Chicago, Crawford Savings and Loan Association, Republic Federal Savings and Loan Association, and one of the accounts at Lawn Savings and Loan Association having been opened prior to the years here in issue and *147 maintained thereafter into or throughout the years here in issue. Other accounts, including additional accounts at Lawn Savings and Loan Association, Trident Savings and Loan Association, Hemlock Federal Savings and Loan Association, two accounts at Lawn Manor Savings and Loan Association, and an account for John W. Weiland as beneficiary, naming petitioner as trustee, at the General Savings and Loan Association, were opened during the years here in issue. [4]
On July 26, 1960, petitioner loaned $1,000 to the New Park Hospital Corporation (now known as Jackson Park Hospital) and received the corporation's note in that amount. This loan was still outstanding as of December 31, 1962, but was paid in full on July 3, 1963. *148 In 1952 petitioner opened a brokerage account with Oppenheimer, Vanden Broeck and Company (now Oppenheimer, Newborg and Neu). [5] He thereafter made the following purchases through this account in 1953: No. of shares
Date
Name of stock
purchased
purchased
Cost
Robert Gair Co., Inc
20
Jan. 9
$ 398.06
U.S. Gypsum Co.
10
Jan. 9
1,176.12
New England Tel. & Tel
20
Jan. 20
2,228.45
Flintkote Co.
50
Feb. 11
1,547.38
American Tel. & Tel
10
Apr. 10
1,554.10
Pacific Tel. & Tel
10
June 10
1,153.50
None of these shares was sold by petitioner during the year 1953, the first sale of any of the stock purchased in 1953 being on February 15, 1955, when he sold the 10 shares of United StatesGypsum Company. During 1954 petitioner purchased through this account 25 shares of Bristol Myers Company stock on November 17, 1954, for $697.44. He sold this stock on August 15, 1956. During 1955 petitioner purchased through this account various stocks in the total amount of $5,092.43 and made *149 no sales of the stock purchased in that year, the only sale of stock from this account being that 625 noted above of United StatesGypsum Company stock. In 1956 petitioner purchased through this account various shares of stock at a cost of $8,498, and sold none of these stocks during that year, the only sale of stock made during that year through this account being, as above stated, of the Bristol Myers Company stock bought in 1954. During 1957 petitioner made purchases through this account of stock at a total price of $2,250.75 and no sales were made. The last purchase was on June 28, 1957, and after that date there were no purchases or sales through this account through the end of 1962. On or about August 23, 1955, petitioner opened a brokerage account with Cruttenden and Company which in 1957 became Cruttenden, Podesta and Company, Chicago, Illinois. During 1955 petitioner purchased various stocks through this account, the total amount of such purchases being $6,519.28. In 1955 he sold one of the stocks purchased in that year for $1,060.41. During 1956 petitioner purchased various stocks through this account at a cost of $8,310.82 and made three sales of stock from this *150 account totaling $2,259.32. In 1957 petitioner made two purchases of stock through this account at a total cost of $3,018.98 and made no sales in that year. In 1956 petitioner made three purchases of stock through this account at a total cost of $4,300 and made no sales. In 1959 petitioner made four purchases of stock through this account at a total cost of $9,956.58 and made no sales through this account. On or about August 1, 1956, petitioner opened brokerage account No. XXX X6805 at Merrill Lynch, Pierce, Fenner and Beane (now Merrill Lynch, Pierce, Fenner and Smith), and on or about February 27, 1961, he opened brokerage account No. XXX X4326 with Merrill Lynch, Pierce, Fenner and Smith. On or about May 31, 1961, petitioner opened brokerage account No. XXX X6468 with this broker. In 1956 he made two stock purchases through account No. XXX X6805 at a total cost of $3,540.23, and he made no sales of stock through that account in that year. In 1957 he made four stock purchases through account No. XXX X6805 at a total cost of $1,378.03 and no sales. Petitioner made no further purchases or sales of stock through his accounts with Merrill Lynch, Pierce, Fenner and Smith until 1961 *151 when he made the following purchases: Account
Date
No. of
No.
Stock
purchased
shares
Cost
XXX X4326
Denver Rio Grande Western
Mar. 13, 1961
100
$1,900.99
XXX X6468
General Motors
May 31, 1961
50
2,302.90
XXX X6468
Tenney Engineers, Inc
June 1, 1961
100
979.28
XXX X6468
Chemetron Corporation
June 19, 1961
100
2,883.40
XXX X6468
San Diego Gas & Electric
June 19, 1961
100
3,235.15
XXX X6468
Gulf Oil Corp
June 27, 1961
96
3,696.00 On June 9, 1961, petitioner made a sale through account No. XXX X6468 of 100 shares of American Viscose stock which had been previously purchased through other accounts at a total selling price of $6,048.33. On or about December 1, 1959, petitioner opened a brokerage account with Hornblower and Weeks (now Hornblower and Weeks-Hemphill Noyes). During 1959 petitioner made stock purchases through this account in the amount of $3,608.09, and during the year 1960 he made stock purchases through this account in the amount of $10,564.12. In 1961 petitioner made the following purchases through this account: Date
No. of
Stock
Purchased
Shares
Cost
El Paso Natural Gas
Feb. 10
100
$ 2,782.90
B. F. Goodrich
Feb. 20
100
5,175.00
Denver Rio Grande Western
Mar. 7
100
1,913.53
Pure Oil Co.
Mar. 17
50
1,785.28
General Dynamics Corp.
Mar. 21
100
4,039.15
General Dynamics Corp.
Apr. 24
100
3,863.28
Union Oil Calif
Apr. 27
25
1,444.25
Paramount Pictures
Apr. 27
25
1,962.03
General Electric
May 1, 1961
50
3,132.65
Champion Paper Fiber
May 2
100
3,084.40
Parke Davis
June 19
100
3,587.50
Paramount Pictures
July 24
25
1,785.28
U.S. Gypsum Co.
July 27
25
2,435.43
Corn Products Co.
Aug. 3
25 1,333.94
Total $38,324.62
*152 626 Petitioner made no sales through this account. There was no activity in this account during the calendar year 1962. On or about July 12, 1960, petitioner opened a brokerage account with Hayden, Stone and Company, Chicago, Illinois. During the year 1960 petitioner made purchases of stock through this account totaling $10,962.44, and he made sales of stock through this account totaling $11,205.80. There were no purchases or sales made through this account during the calendar years 1961 and 1962. On or about May 4, 1961, Petitioner opened a brokerage account with Goodbody and Company. He made two purcases through this account, one of 25 shares of United StatesGypsum on May 4, 1961, at a cost of $2,638.28 and the other of 100 shares of Parke Davis and Company on June 14, 1961, at a cost of $3,787.90. There were no sales through this account in 1961, and no purchases or sales in 1962. On or about November 8, 1961, petitioner opened a brokerage account with J. R. Williston and Beane, New York, New York. He made one purchase through this account in 1961 which was of 100 shares of General Tel & Electronics on November 8 at a cost of $2,431. There was no other activity in this *153 account during the years 1961 and 1962. On February 27, 1961, petitioner opened a brokerage account with McDonnell and Company, New York, New York. During 1961 he made the following purchases and sales through this account: No. of
Date
Date
Stock
shares
purchased
Cost
sold
Price
Martin Co.
100
Feb. 27
$ 3,436.00
Gamble Skogmo Inc.
100
Feb. 28
2,682.25
Denver Rio Grande Western
100
Mar. 2
1,963.88
Midland Ross Corp
50
Mar. 16
2,692.81
Martin Co.
100
Apr. 4
3,461.13
Martin Co.
100
Apr. 10
3,247.56
National Gypsum
100
Apr. 24
5,744.70
Midland Ross Corporation
50
May 4
2,441.56
Unexcelled Chemical
100
May 12
1,989.13
June 6
[1] $2,005.27
Southern Rlty & Util.
100
May 12
979.13
Slick Airways
100
May 12
1,042.25
Jetronic Indust.
100
May 15
941.25
Schick Inc.
100
May 17
1,168.50
May 23
[2] 1,189.86
Tenney Engineering
100
May 17
1,256.88
Kaltman D. & Co.
200
May 17
948.26
Kayser Roth & Co.
100
May 19
2,330.00
Totals $36,325.29
$3,195.13
On or *154 about June 26, 1961, petitioner opened a brokerage account with Reynolds and Company, New York, New York. During the balance of the year 1961 he purchased various shares of stock at a total cost of $12,690 through this account and made no sales through this account. There was no activity in this account during the year 1962. As of December 31, 1953 through December 31, 1962, petitioner owned stock and securities with a cost basis as indicated below: Year ended
December 31
Amount
1953
$ 8,054.19
1954
8,751.54
1955
18,126.72
1956
35,519.76
1957
42,167.52
1958
46,467.52
1959
60,032.13
1960
70,352.89
1961
174,512.83
1962
174,512.83 627 The above totals include five shares of American Telephone and Telegraph Company stock purchased by petitioner directly from the company for $430 on March 13, 1961, and 25 shares of stock of the New England Telephone and Telegraph Company purchased by petitioner directly from the company on May 3, 1961, for $1,050. Also included therein are 31 shares of stock of Pacific Northwest Bell Telephone Company purchased by petitioner directly from the company on October 3, 1961, for $496, and 12 shares of stock of *155 the San Diego Gas and Electric Company purchased by petitioner directly from the company on September 30, 1962, for $372. In March of 1955 petitioner purchased a 1955 Oldsmobile 2 door model 88, at a cost of $3,000. Petitioner owned this car until March 20, 1961, when he purchased a 1961 Cadillac convertible for $5,400. He owned the Cadillac throughout the balance of 1961 and throughout the year 1962. On July 27, 1957 petitioner filed an application with Talman Federal Savings and Loan Association of Chicago for a mortgage loan to purchase the property at 5625 South Pulaski Road in Chicago, Illinois. In this application, he showed his annual income as $9,000 plus. He showed his assets to be $20,000, consisting of $2,000 earnest money deposit, $6,000 cash on hand, $2,000 in a checking account at Exchange National Bank, and $10,000 in a savings account at the General Savings and Loan Association. Petitioner signed this statement under the following statement printed in bold type: THAT ALL STATEMENTS MADE IN THIS APPLICATION ARE TRUE TO THE BEST OF MY/OUR KNOWLEDGE AND BELIEF AND HAVE BEEN MADE WITH THE ACTUAL INTENTION THAT THE ASSOCIATION SHOULD RELY THEREON Petitioner received *156 a mortgage loan on the basis of this application in the amount of $22,000. There was an escrow account maintained in connection with this mortgage and petitioner's balances in this escrow account as of December 31, 1958, 1959, 1960, 1961, and 1962 were $428.08, $463.60, $198.70, $402.00, and $450.54, respectively. The outstanding balances on the mortgage as of the end of each of the above designated years were $16,383.88, $15,882.41, $15,350.15, $14,895.74, and $14,284.03, respectively. On May 4, 1961, petitioner applied to the Talman Federal Savings and Loan Association of Chicago for a mortgage loan in the amount of $45,000 on the property located at 6165 South Archer Avenue, Chicago, Illinois. On this application petitioner showed estimated value of the property to be $75,000, and under "Annual Income" showed an amount of $50,000 plus with the statement, "est. new office," plus $4,200 of other income making a total of $54,200. Under assets petitioner showed total assets of $105,000 [sic] consisting of earnest money deposit of $5,000, cash on hand of $67,000, savings account at Talman Federal Savings and Loan Association of $10,000, and equity in real estate owned of $25,000. *157 Petitioner signed the application below a statement that the statements made in the application were true to the best of his knowledge and belief and had been made with the intention that the Association rely thereon. The mortgage loan was made to petitioner on or about August 19, 1961. There was an escrow account in connection with this loan in which the balances as of December 31, 1961, and December 31, 1962, were $720 and $640, respectively. The balances due on this mortgage as of December 31, 1961 and December 31, 1962, were $44,529.66 and $42,578.97, respectively. In addition to the above mortgages, petitioner on August 18, 1961, executed a second mortgage in respect to the Garfield Ridge Medical Center property on South Archer Avenue in the amount of $68,000, and on April 7, 1961, borrowed $9,000 from the Drovers National Bank of Chicago on the security of some of his stock, and on May 2, 1961, borrowed $15,000 from this same bank on the security of his stock. On August 14, 1961, petitioner borrowed $10,000 from the Drovers National Bank of Chicago secured by stock, and on August 18, 1961, borrowed $71,000 from this bank secured by stock. On November 16, 1961, petitioner borrowed *158 $65,000 from the Drovers National Bank, and on February 19, 1962, borrowed $21,000 from this bank, both of which loans were secured by stock. On April 18, 1962, petitioner again borrowed $55,000 from the Drovers National Bank, and again secured the loan by stock. As of December 31, 1961, there was outstanding on petitioner's loans from the Drovers National Bank $37,500, and as of December 31, 1962, there was outstanding on these loans $10,000. Petitioner on March 20, 1961, borrowed $4,360 from the Exchange National Bank, giving a chattel mortgage on his 1961 Cadillac convertible as security. As of December 31, 1961, there was a balance due 628 on this mortgage of $2,722, and as of December 31, 1962, there was outstanding on this loan $538. In addition to the property on South Pulaski Road, automobiles, and the Garfield Ridge Medical Center property on South Archer Avenue, petitioner owned furniture, fixtures, and equipment. Petitioner's reserve for depreciation on the building on South Pulaski Road as of December 31, 1958 through December 31, 1962 was $986.40, $1,341.12, $1,695.84, $2,050.56, and $2,405.28 respectively. [6]
*159 Of the $185,000 paid by petitioner for the Garfield Ridge Medical Center, $40,000 was properly allocable to land, $79,000 to the building, $24,354 to equipment, furniture and fixtures, and $41,646 to goodwill. As of December 31, 1961 and 1962, petitioner's reserve for depreciation on the furniture and fixtures at the South Archer Avenue property was $811.72 and $3,247.12, respectively. The reserve for depreciation on the building located at 6165 South Archer Avenue as of December 31, 1961 and 1962 was $789.21 and $3,159.21, respectively. The following schedule shows petitioner's net assets other than cash not on deposit in a financial institution and net liabilities as of December 31, 1958, 1959, 1960, 1961, and 1962: Assets
1958
1959
1960
1961
1962
Cash in banks
$ 669.67
$ 944.44
$ 1,076.25
$ 6,110.39
$ 4,368.35
Cash in Federal Savings and Loan Association
46,134.11
58,752.09
70,000.26
45,660.12
66,106.02
Escrow funds
428.08
463.60
198.70
1,122.00
1,090.54
Notes receivable
1,000.00
1,000.00
1,000.00
Supplies inventory
1,121.75
Stocks
46,465.51
60,030.18
70,350.94
174,209.37
174,581.37
Automobile (business and personal)
3,000.00
3,000.00
3,000.00
5,400.00
5,400.00
Furniture, fixtures and equipment
4,155.00
4,935.00
4,935.00
29,289.00
29,702.85
Real estate
36,900.00
36,900.00
36,900.00
155,900.00
155,900.00
Goodwill
41,646.00
41,646.00
Total assets
$137,752.37
$165,025.31
$187,461.15
$460,336.88
$480.916.88
Liabilities
Mortgage payable
$ 16,383.88
$ 15,882.41
$ 15,350.15
$ 59,425.40
$ 56,863.00
Loans and note payable
108,222.00
10,538.00
Reserve for depreciation 6,127.15
7,404.62
8,372.09
8,766.49
15,526.75
Total liabilities
$ 22,511.03
$ 23,287.03
$ 23,722.24
$176,413.89
$ 82,927.75
*160 The following schedule shows the amount of petitioner's personal expenditures and dividend exclusions for the years 1959, 1960, 1961, and 1962, nontaxable portion of capital gains, capital loss carryover and proceeds from a personal injury suit during the years 1959, 1960, 1961, and 1962. 1959
1960
1961
1962
ADDITIONS:
Food, clothing, etc.
$1,000.00
$1,000.00
$1,000.00
$1,000.00
Medical insurance
130.04
130.04
130.04
130.04
Auto expense (personal)
168.60
155.20
183.72
House expense
115.70
126.30
116.72
90.00
Federal income taxes
309.84
1,216.46
15.72
104.40
Interest expense:
Residence (personal portion)
530.33
513.59
498.26
480.18
Auto (personal portion)
13.40
17.88
Real estate taxes:
Residence (personal portion)
297.80
286.19
325.36
359.66
Garfield Ridge Medical Center (por- tion claimed $445.49 less $302.03 per proration in 1961)
143.46
Loss in disposition of auto
300.00
Nondeductible portion of capital loss
882.48
Investment credit
31.15
TOTAL ADDITIONS $2,552.31
$4,310.26
$2,399.50
$2,540.49
DEDUCTIONS:
Nontaxable portion of capital gains
$ 663.13
Capital loss carryover from 1960
882.48
Net proceeds of personal injury suit
2,897.00
Dividend exclusions $ 50.00
$ 50.00
50.00
$ 50.00
TOTAL DEDUCTIONS $ 50.00
$ 50.00
$4,492.61
$ 50.00
*161 629 In April 1963 Libert sent a notice to petitioner that he proposed to return to medical and surgical practice on April 24, 1963, temporarily at 6161 South Archer Avenue, Chicago, Illinois, and that he would permanently establish his office at 6167 South Archer Avenue. The address at 6161 South Archer Avenue is located in very close proximity to 6165 South Archer Avenue, the location of the Garfield Ridge Medical Center, and the address at 6167 South Archer Avenue is approximately one block from the Garfield Ridge Medical Center location. After receiving this notice petitioner filed a suit in the Circuit Court of Cook County, Illinois, Chancery Division, to enjoin Libert from opening an office for the practice of medicine at either of the Archer Avenue addresses. Testimony in this suit was taken before a Master in Chancery. In his testimony in connection with this suit petitioner first denied signing the supplemental agreement of sale releasing Libert from his covenant not to compete in return for Libert's agreeing to work at the Garfield Ridge Medical Center for an extra 3 months and later admitted that he signed the document, but stated that Libert obtained his signature *162 through fraud and trickery. In his testimony in connection with this suit petitioner stated that he considered of the total payment of $185,000 for the property and medical practice at the Garfield Ridge Medical Center, $110,000 was paid for the medical practice. Petitioner testified that Libert had told him that the practice at the medical center was a "gold mine." The Master in Chancery decided the case against petitioner, and the Master's decision was affirmed by the Circuit Court of Cook County. Petitioner appealed the decision of the Circuit Court of Cook County to the Appellate Court of Illinois, First District, and the Appellate Court affirmed the decision of the Circuit Court. The Supreme Court of Illinois refused to grant certiorari in the case. Investigation of petitioner's Federal income tax returns for the years 1959, 1960, and 1961 was begun by an Internal Revenue Service agent on April 18, 1963. Later this agent was assigned petitioner's Federal income tax return for the year 1962 for investigation. The agent first called on petitioner in connection with this investigation at the Garfield Ridge Medical Center on May 14, 1963. At this first interview the agent inquired *163 as to where petitioner obtained the money to purchase the Garfield Ridge Medical Center and the various stocks he bought in 1961. Petitioner told the agent that the money came from cash which he had brought with him from Europe. However, he refused to tell the agent the amount of cash he had brought with him, stating that he had shown passbooks from the Dime Savings Bank of Brooklyn, New York and the Manufacturers Trust Company of New York City to another agent in proof of the fact that he had brought cash money when he came to the United States. The revenue agent also inquired about petitioner's savings and loan accounts, and petitioner informed him only of the accounts at the Trident Savings and Loan, Crawford Savings and Loan, General Savings and Loan, and Talman Federal Savings and Loan. The agent inquired about petitioner's brokerage accounts and was informed that the only brokerage accounts he had were with Cruttenden Podesta and Company, Merrill Lynch, Pierce, Fenner and Smith, Hornblower and Weeks-Hemphill Noyes, Hayden Stone and Company, McDonnell and Company, and J. R. Willston and Beane. Petitioner told the agent that he had checking accounts at the Exchange National *164 630 Bank and Drovers National Bank. He also stated that he had had a safe-deposit box at the Exchange National Bank in Chicago, but had transferred it to the Talman Federal Savings and Loan Association and that as of the date of the interview the only safe-deposit box he maintained was at the Talman Federal Savings and Loan Association. Petitioner stated to the agent that he had reported all of his income from his medical practice, dividends, and interest from savings accounts for the years 1959, 1960, and 1961. In further interviews with petitioner, he refused to give the revenue agent any more information regarding the cash he said he brought from Germany. On August 29, 1963, a special agent accompanied the revenue agent to interview petitioner. The special agent asked petitioner how he arrived at the gross receipts for 1961 that were listed on the separate Schedule C of his tax return for the Garfield Ridge Medical Center. Petitioner stated that he kept a receipt book in which he recorded the names of his patients and the amounts he received from those patients, that at the end of every month he totaled these amounts and gave them to his accountant for the accountant to *165 add up and put on his income tax returns. The special agent asked petitioner how he arrived at the receipts for the South Pulaski Road practice. Petitioner told him that he kept a book in which he entered at the end of every day the total amount of income he received that day, but that he did not enter the patient's name in this book. Petitioner stated that once a week he transcribed from this book onto a sheet of paper, the daily amounts that he had entered in the book, and at the end of the year, he added up the amounts he had on the sheets of paper for his income tax returns. The agent asked petitioner if all the deductions in his 1961 return were correct and petitioner stated that they were with the exception of depreciation, that the accountant had made a mistake and used the cost basis of the medical center of the previous owner, and that the cost basis should have been higher. Petitioner stated that his deductions with respect to 1959 and 1960 were correct. Petitioner told the special agent that all the checks received from patients were deposited in his checking accounts, either at the Exchange National Bank or the Drovers National Bank, but that sometimes he used cash *166 that he received from patients to pay bills and sometimes deposited cash in his checking accounts and sometimes in his savings accounts, and sometimes put some of it in his safe deposit box. Petitioner said he could not remember the names of any attorneys from whom he had received medical fees. Petitioner furnished the special agent with the patient cards from both his Garfield Ridge Medical Center practice and his South Pulaski Road office practice, his monthly bank statements and canceled checks from his Garfield Ridge Medical Center practice, and patient receipt books for the Garfield Ridge Medical Center. The agent made copies of some of the patient record cards in petitioner's office. He took with him some of the other documents which he returned to petitioner on September 19, 1963, when he again met with petitioner and the internal revenue agent. At the meeting with the special agent on August 29, 1963, petitioner told the special agent that the money he used to buy the stock and to purchase the Garfield Ridge Medical Center in 1961 was brought with him from Germany in "D" Marks. Petitioner stated that he exchanged the "D" Marks at banks in New York City and in Philadelphia, *167 and that he probably exchanged some of them for American money at the American Express Company. He stated that he exchanged the money by just walking up to the teller at the bank and asking him to make the exchange, that he was not required to sign any paper in making any exchange. Petitioner said that he had a safe-deposit box in New York and that he put the American dollars he received in exchange for the "D" Marks in that box and drew them out little by little. Petitioner said later when he got a safe-deposit box in Chicago, he made three trips from New York to Chicago to bring the cash from the safedeposit box in New York to place it in the safe-deposit box in Chicago. Petitioner stated that he did not keep any currency in his residence but kept it all in the safe-deposit box. The special agent asked if he and the revenue agent could examine petitioner's safe-deposit box in petitioner's presence, and petitioner refused to permit them to examine it. 631 On September 19, 1963, when the special agent returned the records he had received from petitioner to petitioner, he told petitioner that the receipts shown in the receipt book for the Garfield Ridge Medical Center practice *168 did not add up in either 1961 or 1962 to the amounts reported by petitioner on his income tax returns but were less than those amounts. Petitioner said that these differences which were only about $5,000 in 1961 and $20,000 in 1962, represented small currency payments that he received from patients which he did not have the time to record and could not hire people to record. Petitioner stated that these would have been payments in currency of $5 or less, that all payments over $5 were recorded in the book. Petitioner stated that he kept records of small amounts on slips of paper, and that at the end of the month he ran up the amounts on the daily slips of paper on a tape and threw the slips of paper away and that the amount of the tapes was added to the amount shown in his receipt book to determine his receipts. Petitioner was requested to furnish the agents with the tapes but never did. The agent inquired of petitioner as to why the amount of rental income which he received in 1961 and 1962 from rentals of offices at the Garfield Ridge Medical Center were not included in his 1961 and 1962 tax returns. Petitioner stated that he did not know but would check his records. The agent *169 asked petitioner which records he would have to check, and petitioner replied that he would have to check with his accountant. No records of the rental receipts were ever furnished to the revenue agent. Petitioner stated to the special agent and the revenue agent that he never extended credit to patients treated at the South Pulaski Road office. When the agent asked petitioner to permit him to see the little book he kept with respect to the Pulaski Road office in which he recorded the daily amounts of receipts and other records relating to the practice at that office, petitioner brought a brown paper sack full of canceled checks and statements, stating that these were all the records he had, and explained that his Pulaski Road office had been burglarized twice and that in cleaning up the office he had probably thrown some of his records away. The special agent asked petitioner if he did not have some records in a drawer underneath his examination table, and petitioner told him there were records there. He opened this drawer and handed the special agent various records from the drawer, one of which was the sheet containing daily receipt notations which was attached to the retained *170 copy of petitioner's 1959 income tax return. Petitioner told the agent that was the daily sheet on which he entered the figures from the little book, but he never supplied the agent with the little book. Petitioner produced no records to substantiate the deductions claimed on his tax returns other than some few check stubs. Petitioner stated that the other records had been misplaced. In March of 1964 there was a reassignment of special agents to the investigation of petitioner's income tax returns. The newly assigned special agent interviewed petitioner at the Garfield Ridge Medical Center on July 23, 1964. This special agent again asked petitioner about the funds he brought into the country and was told that petitioner would give no further information about those funds. The agent also inquired as to the amounts shown on patient's cards and why petitioner had borrowed the moneys he had borrowed. Petitioner stated that he borrowed the moneys to establish his credit and gave approximately the same explanation with respect to the absence of records to the second agent as he had to the first. He repeated to the second agent that he had deposited all checks received from his patients *171 in one of his checking accounts. Petitioner was asked about receipts from insurance companies, from the State of Illinois for the treatment of persons entitled to public aid, and with respect to other checks. The agent then showed petitioner copies of checks which had been obtained from various banks which were drawn to petitioner's order by various attorneys in connection with medical services, from various insurance companies, and from the State of Illinois with respect to payments for public aid patients. Petitioner was unable to explain where these amounts were recorded in his books or records. When the agents were unable to obtain information from which to determine petitioner's receipts from his medical practice, they circularized various patients whose names appeared on patient's cards at the South Pulaski Road office to develop from third-party sources this information with respect to 1959 and 1960 and to some extent to 1961, but did not circularize with respect to 1962 and did no circularizing with 632 respect to patients of the Garfield Ridge Medical Center. Petitioner in fact deposited in 1959 and 1960 numerous checks from patients, from the State of Illinois for *172 public aid payments, and from payments of medical fees of patients by insurance companies to his savings account at Republic Federal Savings and Loan Association, Talman Federal Savings and Loan Association, and Trident Savings and Loan Association. During 1961 petitioner deposited numerous checks received from patients, the State of Illinois for public aid patients, and various insurance companies including the Blue Shield Plan and others in his accounts at Lawn Manor Savings and Loan Association, and Talman Federal Savings and Loan Association. Petitioner also deposited in these savings accounts dividend checks and other checks. During the years 1955, 1956, 1957, 1958, 1959, 1960, and 1961, petitioner made deposits into his checking account at the Exchange National Bank of Chicago in the amounts of $18,993.67, $30,901.81, $36,807.79, $9,236.77, $3,750.18, $5,032.46, and $613.60, respectively. During 1961 petitioner made total deposits of $192,987.89 to this checking account entitled, Stanley Turzynski, M.D." at the Drovers National Bank of Chicago, Illinois. These deposits consisted of $45,750 deposits of cash, $43,487.91 deposits of checks and $103,749.98 deposits from loan *173 proceeds. During the year 1962, petitioner made total deposits of $84,900.02 to his checking account in the name of Stanley Turzynski, M.D., at the Drovers National Bank of Chicago, the deposits being comprised of $23,500 in cash $6,400.02 in checks, and $55,000 proceeds of loan. During the year 1961 petitioner made total deposits of $23,674.61 to his checking account under the name of Garfield Ridge Medical Center at the Drovers National Bank. These deposits were composed of cash deposits of $3,500 and check deposits of $20,174.61. During the year 1962, petitioner made total deposits of $180,455.81 to his checking account under the name of Garfield Ridge Medical Center at the Drovers National Bank of Chicago, these deposits being comprised of $48,500 cash deposits, $130,395.20 check deposits, and $1,560.61 of the deposits was unidentified. During the years of World War II, the money in circulation in Germany was increased about ten times over its previous level but prices were controlled and maintained at approximately the level they had been prior to the increase of the money in circulation. After the War when the United States Military Government took control of certain *174 parts of Germany, it investigated the situation with respect to the German currency and started in early June of 1945 to plan for some form of currency exchange. At that time and continuing into later years prior to the currency exchange act, many people in Germany had Reichsmarks far in excess of the number they could legally spend for goods and services at the legal price established for such goods and services. Food and certain other items were rationed and available in limited quantities. Only very small quantities of other consumer goods were available. The United States set up a rate of exchange for Reichsmarks which was applicable only for internal purposes of the United States Army in exchanging money for servicemen. The rate set up was 10 Reichsmarks to a dollar and was geared to the relative purchasing power of a mark in Germany and a dollar in the United States at the legal price rates. The United States Military Government, German Supreme Command, shortly after taking over its area of Germany, placed in effect a law entitled, "Foreign Exchange Control Act" which prohibited all persons in Germany from conducting any transactions, unless licensed, with any foreign exchange *175 asset including United States currency and any currency other than German currency. This law also required all persons in Germany who had any foreign currency including United States currency to surrender the same to the nearest branch of the Reichsbank and receive a receipt for the assets deposited. However, in spite of this law, there was an active black market during the period following the surrender of Germany in 1945 up to June 20, 1948, for exchange of Reichsmarks for United States dollars. During this period the black market exchange rate fluctuated from a minimum of 175 Reichsmarks to the dollar to a maximum of well over 200 Reichsmarks to a dollar, and the average Reichsmark exchange rate during this period was approximately 200 Reichsmarks to a dollar. The United States Military Government was aware of the 633 activity in the black market exchange of Reichsmarks for dollars and considered this fact in working toward a currency reform act to be put into effect in Germany. There were rumors rampant in Germany from May 1945 until such an Act was actually put into effect on June 20, 1948, that some form of currency reform was imminent. The placing of such an Act in effect *176 in the areas subject to the United States Military Government was delayed because of an effort by the Allied Forces to work out a joint reform act with all parties including the Russians participating. The West German Currency Reform Act, put into effect by the United States Military Goverment, was announced shortly before June 20, 1948, and became effective on that date which was a Sunday. This Act established the Deutschemark as the new West German currency and invalidated the Reichsmark as the basic unit of West German currency. Small Reichsmark notes of one Reichsmark or less and small coins were permitted in use for a short time and were to be accorded one-tenth of their face value. Any person living within the West German economy and not in a displaced persons camp could only obtain a maximum of 40 Deutschemarks on June 21, 1948, when the currency reform went into effect. These 40 Deutschemarks were issued to the individual from the same agency that was responsible for issuing food rationing cards. At a subsequent date within a 2-month period, this individual could obtain another 20 Deutschemarks from the ration office. These 60 Deutschemarks were issued to individuals on a *177 basis of one Deutschemark for one Reichsmark. The only exception to the rule of a limit of 60 Deutschemarks issued through the ration office at the beginning of the period in which the currency reform was taking place was for business enterprises, professional people, and associations who were granted advances of Deutschemarks for Reichsmarks to meet payrolls for employees in an amount of 60 Deutschemarks for each employee. These advances were applied against the firm's or business' subsequent conversion right of Reichsmarks to Deutschemarks. Any Reichsmarks that an individual had in excess of 60 could be exchanged by such individual by taking the balance of the Reichsmarks he had over 60 to one bank or one exchange agency and surrendering or depositing the Reichsmarks with that agency. Upon deposit of the Reichsmarks with the bank or exchange agency, the individual was required to prepare a detailed form and answer a detailed questionnaire with respect to how his Reichsmarks were acquired. The United States Military Government devised the questionnaire with questions tending to discourage persons who had illicit holdings of Reichsmarks received from black marketeers from bringing *178 such Reichsmarks in for exchange. When an individual presented his Reichsmarks for lodgement with a bank and filed the required form including the answers to the questionnaire with that bank, he was required to produce his identity card. An individual could legally obtain only one identity card. When the identity card was produced, the bank or exchange agency punched the first page of the identity card in the upper right hand corner. In order to make an exchange of Reichsmarks at a bank, an individual had to produce an unpunched identity card at that particular bank. A banking institution or exchange agency was prohibited from accepting Reichsmarks except upon the producing of an identity card which had not been punched. In order to obtain the exchange of Reichsmarks for Deutschemarks, all Reichmarks, except small Reichsmarks notes or small Reichsmarks coins, had to be surrendered at a bank or exchange agency by June 26, 1948. Any Reichsmarks not surrendered by that date, other than in the small denominations indicated were invalidated. When an individual deposited his Reichsmarks, the form which he filed was in triplicate. He retained one copy and the bank or exchange office kept *179 two copies, one for itself and one which it furnished to the tax office. When an individual deposited his Reichsmarks with the bank or exchange agency, these Reichsmarks were counted and a receipt for the number of Reichsmarks turned in given to the individual. Each individual who timely turned in his Reichsmarks, if on the face of the paper filed he appeared to be entitled to exchange the Reichsmarks for Deutschemarks, would receive a maximum of an additional 250 Deutschemarks during the week of June 27, 1948, at the rate of one Deutschemark for every ten Reichsmarks surrendered or deposited. However, in the initial payout of the 250 Deutschemarks, only one-half of this rate was paid so that in order to receive the 250 Deutschemarks, an individual was required to turn in 5,000 Reichsmarks. The remaining 250 Deutschemarks were held in a blocked account. Any Reichsmarks turned in by an individual to a bank or 634 exchange agency in excess of 5,000 were converted into Deutschemarks only with the approval of the tax office after an investigation was conducted to determine if all taxes had been paid on the Reichsmarks and if all the Reichsmarks had been acquired legally. Violation *180 of the provisions of the German Currency Reform Act was a criminal offense and conviction of violation of that Act was punishable by fine and imprisonment. If the tax office authorized conversion of an amount of Reichsmarks in excess of 5,000 for an individual, the rate of exchange was 100 Reichsmarks to 6 1/2 Deutschemarks, and the conversion would take place over a period of several months. Blocked accounts of 250 Deutschemarks resulting from an exchange of 5,000 Reichsmarks during the week of June 27, 1948 were not releasable to the owner until October 4, 1948. Under the currency reform, the bank Deutscher Lander was the exclusive agency for the issuance of Deutschemarks to a maximum of 10 billion Deutschemarks, the limit to be raised only under very limited and exceptional circumstances. The Currency Reform Act also provided for the establishment of a federal reserve form of monetary control of banks. The Currency Reform Act put into effect by the United States Military Government in Germany in June of 1948 was determined by the military government to be successful. It has been viewed, generally and by historians, as one of the most successful currency reforms to have taken *181 place. After June 27, 1948, there was some black market activity in Deutschemarks (sometimes referred to as "D" marks) for United States money. However, after that date any Reichsmarks which had not been exchanged for "D" marks were valueless. A 1,000 denomination Reichsmark note was approximately 8 inches by 4 inches or about 1.69 times the size of a United States dollar bill. One hundred and thirty-eight thousand Reichsmarks notes of a denomination of 1,000 Reichsmarks each weighed approximately 480 pounds. Petitioner did not enter safe-deposit box No. B-136 which he maintained at the Exchange National Bank of Chicago, Illinois from October 6, 1960 until April 8, 1961, when he closed out his lease of that box. The only day on which he entered the box after opening it on May 5, 1960 until the date he closed the box was on October 6, 1960. Petitioner entered his safe-deposit box No. 12341 at the Talman Federal Savings and Loan Association, Chicago, Illinois which he opened on January 9, 1961, after closing out box No. 3100 maintained at the Talman Federal Savings and Loan Association, on January 30; February 9 and 27; March 2, 9, 16, 23; and April 3 and 24, 1961. He closed *182 this box on April 24, 1961, and rented safe-deposit box No. 1514 at the Talman Federal Savings and Loan Association. Petitioner entered his safe-deposit box No. 1514 at the Talman Federal Savings and Loan Association after opening it, twice on May 15, 1961, once at 9:15 a.m. and again at 9:29 a.m., once on May 29, June 8 and 29, July 31, August 17, 1961, April 5, 1962, and November 16, 1962. [7]
During the years 1959, 1960, and 1961, petitioner purchased "accommodation checks" at Talman Federal Savings and Loan Association. During the year 1961 petitioner purchased a total of $98,507.33 of "accommodation checks" in amounts ranging from a little less than $2,000 to a maximum of $10,000 at Talman Federal Savings and Loan Association, such checks being purchased on February 9, 20, and 27; March 2, 9, 13 and 17; April 3, 10, and 24; May 2 and 15; June 12, 20, and 29; and July 31. One of the "accommodation checks" *183 purchased on March 16, 1961, in the amount of $3,000 had as a source of funds a withdrawal from petitioner's savings account at Talman Federal Savings and Loan Association, as did an "accommodation check" in the amount of $7,212.50 purchased on June 29, 1961. On March 16, three separate checks were purchased; also on May 2, three checks were purchased. Two checks were purchased on each April 24 and June 12, 1961. On March 10, 1966, a two-count indictment was returned against petitioner in the United States District Court for the Northern District of Illinois, charging him with violation of section 7201, I.R.C. 1954, with respect to his income tax returns for 635 the calendar years 1959 and 1960. On March 21, 1966, petitioner entered a plea of not guilty to the charges set forth in the indictment. After a trial on the merits of the charges in the indictment before a United States District Court Judge, petitioner, on July 31, 1967, was found guilty of violating the provisions of section 7201, I.R.C. 1954, as charged in the indictment, and on that date judgment was entered in accordance with that finding and a sentence imposed against *184 petitioner fining him $5,000 plus costs and placing him on probation for 3 years on each count of the indictment, the sentences to run concurrently. A special condition of probation imposed on petitioner was that he keep accurate books and records regarding income and expenses and exhibit his books and records to his counsel for certification to the probation office. On September 2, 1964, petitioner executed a consent agreement, pursuant to section 6501(c)(4), extending the period within which respondent might assess additional income taxes for the calendar year 1961 to December 31, 1965. Respondent on December 30, 1965, mailed to petitioner, by certified mail, a notice of deficiency determining deficiencies in his Federal income taxes for the years 1961 and 1962. Respondent in his notices of deficiency determined on the basis of net worth plus expenditures computations, adjusted for nontaxable income, that petitioner had taxable income of $28,997.25 for 1959, $26,260.89 for 1960, $118,116.09 for 1961, and $114,956.63 for 1962. In making this determination respondent used a cash on hand other than in banks or other institutions in the amount of $105 as of December 31 of each *185 of the years 1958 through 1962 and determined petitioner's reserve for depreciation on the basis of the Pulaski Road property being used one-third for business purposes and petitioner's basis in the building on South Archer Avenue being $79,000. Respondent also determined that part of the underpayment in tax for each of the years 1959 through 1962 was due to fraud. Ultimate Findings of Fact . Petitioner is collaterally estopped to deny that part of the underpayment of his income taxes for the calendar years 1959 and 1960 was due to fraud with intent to evade taxes, and that his income tax returns for these years were false and fraudulent. 2. On the date of the mailing of respondent's notice of deficiency to petitioner with respect to the calendar years 1961 and 1962, assessment of deficiencies by respondent for those years was not barred by the statute of limitations. 3. Respondent has shown by clear and convincing evidence that a part of the underpayment in petitioner's income taxes for the calendar years 1961 and 1962 was due to fraud with intent to evade tax. 4. The use by respondent of the net worth plus personal expenditures method for determining petitioner's taxable *186 income for each of the years here in issue is proper since petitioner did not maintain books and records adequate for the proper determination of his taxable income. 5. Respondent's determination of petitioner's assets and liabilities and adjustments to net worth for personal expenditures and nontaxable income is correct in all respects, except respondent's determination of cash on hand. Petitioner had cash on hand as of December 31, 1958, of at least $100,105, and had at least this same amount of cash on hand as of December 31, 1959, and December 31, 1960. Of the $100,105 minimum amount of cash on hand which petitioner had as of December 31, 1960, he had as of December 31, 1961, the amount of $40,105 and as of December 31, 1962, the amount of $105. Opinion Petitioner contends that he should not be collaterally estopped with respect to the issue of fraud for the years 1959 and 1960 by reason of his conviction of income tax evasion for these years in the criminal case in the District Court of Illinois for the Northern District, Eastern Division. First, petitioner contends that he should not be collaterally estopped because the agents who investigated his return conspired with *187 Libert and others and that "there was a well conspired pattern in aforesaid alleged 'income tax evasion' case to have petitioner convicted as a 'felon', regardless of the means used for said 'conviction', otherwise said agents, for example, wouldn't have acted so unscrupulous as they did act." Next petitioner contends that he prepared his income tax returns for 1959 and 1960 by himself and did not itemize certain medical practice expenses consisting of 636 various items including rebates to patients from payments by insurance companies and payments of consulting fees to other doctors, and that "in said 'income tax evasion case', the Court did not give petitioner credit for medical practice expenses incurred by him during 1959 and 1960 except for a very small fraction thereof." Petitioner contends that had the Court "given full credit for his medical practice expenses for the years in question, there would not have been any conviction of petitioner for tax evasion." All of these contentions were made by petitioner in the criminal trial and the Court still found against him and held that he was guilty as charged in the indictment. Therefore, these arguments in no way support *188 petitioner's contention that collateral estoppel is not applicable. Finally, petitioner contends that since in the income tax evasion case the Government presented evidence of specific items of omitted income, he cannot be collaterally estopped in this case where the Government has computed his taxable income on the basis of increases in net worth. Petitioner is apparently under the impression that if respondent's contention that collateral estoppel applies with respect to the fraud issue is sustained, collateral estoppel should also apply to the method of determining the amount of petitioner's taxable income for the years 1959 and 1960 so that petitioner's tax for these years would be based only on the specific items of omitted income proved by respondent in the criminal case. Petitioner is incorrect in this contention. The amount of underpayment of tax was not the issue in the criminal case but whether that underpayment was with fraudulent intent to evade tax was the issue there decided. As we stated in John W. Amos, 43 T.C. 50, 55, 56 (1964), affirmed 360 F. 2d 358 (C.A. 4, 1965), the *189 "imposition of the civil penalty prescribed by section 6653(b) depends upon a determination of the ultimate fact that petitioner's underpayment of tax * * * was due to fraud. This ultimate fact for determination herein is the same ultimate fact which was determined adversely to petitioner in the prior criminal proceeding. It is therefore our decision that petitioner is conclusively bound, under the doctrine of collateral estoppel, by that prior adverse determination. * * *" Likewise, the ultimate fact for determination, in order to cause there to be no time limit after which respondent is barred from assessing a tax under section 6501(c), is that the return is "false or fraudulent * * * with intent to evade tax; [8]
The decision of the District *190 Court that petitioner was guilty as charged in the indictment of attempting to evade or defeat tax within the meaning of section 7201 was a finding that petitioner willfully attempted to evade or defeat his income tax for the years 1959 and 1960. In John W. Amos, supra, we held that the determination that the taxpayer did, within the meaning of section 7201, willfully attempt to evade or defeat his income tax, was the same ultimate fact as a determination that a part of the underpayment of tax is due to fraud, which, of course, likewise means that it is the same determination of ultimate fact as the determination that the return is a false or fraudulent return filed with intent to evade tax within the meaning of section 6501(c). We therefore hold that petitioner is collaterally estopped to deny that part of the underpayment of his taxes for the years 1959 and 1960 was due to fraud and that his returns for the years 1959 and 1960 were false and fraudulent returns. Therefore, assessment of deficiencies for the years 1959 and 1960 is not barred by the statute of limitations. Petitioner was not convicted, or for that matter indicted, for income tax evasion for the years *191 1961 and 1962. Therefore, respondent must show as to these years by clear and convincing evidence that part of the underpayment in petitioner's tax was due to fraud in order to sustain the addition to tax under section 6653(b). Petitioner in his argument confuses respondent's burden with respect to establishing fraud and the burden on petitioner to show error in respondent's determination of the amount of the tax liability. Petitioner does not specifically argue that an assessment of a deficiency for 1961 and 1962 is barred by the statute of limitations absent a showing of fraud. However, some of his arguments border on 637 this, so we have included in our findings the facts to show that there is no bar of the statute of limitations to respondent's assessment of a deficiency for the years 1961 and 1962 and have so found as an ultimate fact. However, respondent is in no way relieved from his burden of showing that for 1961 and 1962 part of the underpayment of tax is due to fraud. In our view the evidence is clear and convincing that part of the underpayment for those years was due to fraud. In the first place there were specific omissions of income from petitioner's returns *192 in both of the years. For the year 1961 there were omissions of interest income, capital gains, and rental income, as well as receipts from petitioner's medical practice. These amounts of income were substantial in relation to the income reported by petitioner. Petitioner argues that the failure to report interest should be overlooked since at that time banks did not notify individuals of the interest accumulated on their accounts and added to their accounts. However, where the interest from certain accounts was reported but interest was not reported from other accounts, this contention is not a satisfactory explanation for the failure to include all interest in income. Petitioner on his returns had reported certain capital losses and in the light of this fact and of the fact that no explanation is given of the failure to report capital gains, the failure to report capital gains likewise indicates fraud. Petitioner's only explanation for his failure to report rental income is his contention that this income was included in his medical receipts as reported. However, the facts do not support this contention of petitioner. Petitioner has given no satisfactory explanation as to his failure *193 to report all of his receipts from patients. In 1962 petitioner failed to report $3,870 of rentals and $747.25 of interest. No satisfactory explanation of this failure is given. Furthermore petitioner kept no record of medical receipts and the clear indication from the record is that his income from not only his practice on Pulaski Road for this year but also from his practice at Garfield Ridge Medical Center was greatly in excess of the amount he reported. On petitioner's 1962 return he claimed depreciation on the building in which the Garfield Ridge Medical Center was operated based on a value of the building of $165,000, although he had only shown a value of the land and building of not over $75,000 when he purchased it, and later, in effect, in the suit he instituted against Libert made this same contention. Petitioner misrepresented facts to the revenue agents investigating his case. He told them that all checks for medical receipts were deposited in his checking account when in fact numerous such checks were deposited in his savings account. He produced no records for the revenue agents from which they could in any way verify his receipts or expenses. When the omissions from *194 income are considered in conjunction with (1) petitioner's representations on his returns which are contrary to his sworn testimony, (2) petitioner's general evasiveness during the examination of his records, and (3) his failure to keep any proper records of the receipts from his medical practice, we conclude that the evidence is clear and convincing that part of the underpayment in petitioner's income taxes for 1961 and 1962 was due to fraud. We therefore sustain respondent for all the years here in issue in his assertion of the addition to tax for fraud. The remaining issue concerns the amount of income received by petitioner in each of the years here involved. Respondent determined the income received by petitioner by use of the net worth plus nondeductible disbursements minus nontaxable receipts method. The assumption behind such a determination is that the resultant amount represents petitioner's earnings during the taxable year. While it is not a method of accounting, but rather an attempt by respondent to reconstruct a taxpayer's income, absent the proper records from which to determine that income, it has been approved as a system of arriving at a taxpayer's income in an *195 appropriate case. Holland v. United States, 348 U.S. 121 (1954). The facts here show that petitioner's books were totally devoid of accuracy and his income could not be properly computed from such books as he did maintain. Where a taxpayer keeps no books or records or his records are so inadequate as to afford no proper basis for computing his taxable income, respondent is not required to follow any particular method of computing income but may compute it by any method which will, in his opinion, clearly reflect the taxpayer's income. Harold E. Harbin, 40 T.C. 638 373, 377 (1963). In our view respondent was totally justified in the instant case in his use of the net worth method in computing petitioner's taxable income. The only items composing part of the net worth statement which petitioner contests are the cash on hand and the computation of reserve for depreciation. Since the main issue here is petitioner's contention that he had over $500,000 in cash as of December 31, 1958, and that he had remaining at the end of 1962 only $150,000 so that all of his increases in *196 net worth during the years here in issue were from conversion of inactive assets of cash which he had in safe-deposit boxes into other assets, we will first deal with the minor issue concerning depreciation. Petitioner raises two questions with respect to respondent's computation of depreciation. First, he contends that respondent should have determined that 90 percent of the use of his Pulaski Road property was for business purposes and allowed depreciation on this basis. Secondly, he contends that respondent substantially undervalued the Garfield Ridge Medical Center Building when he placed a value of $79,000 on the building and therefore the depreciation on this building should be increased. With respect to the Pulaski Road building, petitioner made no showing of error on the part of respondent in considering that only one-third of the building was used for business. There was some testimony to the effect that three rooms were used by petitioner as an office and very little testimony as to the size of the building. Petitioner apparently does not contend that he used any greater portion of the building for office space than respondent determined but rather contends that he only *197 used one room of the building for personal purposes. He stated he lived in only one room of the house. This leaves unexplained what use was made of the greater portion of the building, so actually it may have been put to no use. In any event petitioner has failed to show error in respondent's determination. We also conclude that petitioner has failed to show error in respondent's determination of depreciation with respect to the Garfield Ridge Medical Center property. In the first place, if the value of the building were increased by decreasing the amount applicable to medical instruments and equipment which petitioner acquired which is part of petitioner's argument, then the overall depreciation allowed to petitioner would be decreased and not increased. However, there is no evidence to show either that the amount allocated to payment for instruments and equipment should be decreased from that determined by respondent or the amount allocated to the building should be increased. Petitioner placed a $75,000 value on the land and building when he bought it, and in effect, placed this value on the land and building when he testified in his suit against Libert. On his 1961 return he *198 showed the value of the building at $65,000 and of the land at $10,000. The evidence shows that the building originally cost somewhere between $70,000 and $90,000 and that approximately $11,000 of this was the cost of an air conditioning system which was between 6 and 7 years old when petitioner acquired the building. On the basis of the evidence in this record we conclude that petitioner has failed to show error in respondent's computation of depreciation. Petitioner, in what apparently is intended to be an additional attack on the net worth computation, claims he sustained a $110,000 loss on his purchase of the Garfield Ridge Medical Center which should be apportioned in some way between 1961 and 1962. Petitioner's support for this is his claim of being defrauded by Libert and a conspiracy against him originated by Libert whereby he paid $110,000 for a medical practice and received nothing for the money. Petitioner has totally failed to show what amount he paid for Libert's medical practice or goodwill as distinguished from a payment for the building and equipment. Respondent allocated a little over $41,000 of petitioner's payment to goodwill. However, petitioner at the end of *199 the years here involved and for at least a number of years thereafter, if not until the present, was still carrying on the practice of medicine at the Garfield Ridge Medical Center. Therefore, whatever payment he may have made for that medical practice did not in 1961 and 1962 result in any loss to petitioner. Except for his contending that the reserve for depreciation computed by respondent is incorrect and contending that in 1961 he had a loss of $110,000 in connection with his purchase of the Garfield Ridge Medical Center practice, petitioner does not contest any item in respondent's 639 net worth computation except the item of cash on hand as of the beginning of each of the years here involved. Petitioner testified that when he came into the United States in January 1951, he brought approximately $692,000 with him, $690,000 in $1,000 and $500 bills of United States currency and 10,000 "D" Marks which he converted to $2,000 in American money. He testified that as of December 31, 1958, he had remaining in cash in his safe-deposit box $510,000 of that amount, that as of December 31, 1959, 1960, 1961, and 1962, he had remaining $470,000, $445,000, $275,000, and $150,000, respectively, *200 of this amount. He testified that he still had some of the cash he had brought with him when he came into the United States in $500 and $1,000 bills in his safe-deposit box at the time of the trial of this case. Petitioner gave the following explanation of his acquisition of the $692,000 in Germany before he came to the United States. Petitioner testified that in the early part of April 1945, he was a prisoner in a Nazi concentration camp at Buchenwald, Germany. He stated that he and a number of other prisoners were taken from the camp, transported first by rail, and later were forcibly marched, through parts of Germany, that approximately 10 or 11 days after they had been taken from the camp he and the other prisoners noticed that the Nazis who had been guarding them had disappeared. Petitioner stated he believed that at the time he noticed the disappearance of their Nazi guards that they were on the outskirts of the town of Schweinfurt, Germany which is in Bavaria. He testified that after the guards disappeared he and another Polish prisoner who was a friend of his walked to Schweinfurt and found the town almost deserted and part of it in ruins. Petitioner stated that he and his *201 friend walked into some building in this town, that he does not remember the type of building or its location, and that in the corridor of this building they saw four heavy canvass sacks approximately 37 or 38 inches by 17 by 17 inches. He stated that he and his friend looked in the sacks and found them to be filled with Reichsmarks in denominations of 500 and 1,000 Reichsmarks. When they saw the contents of these sacks, he and his friend dragged the sacks about one-half mile from the building and then his friend left him with the sacks and went away and obtained a wagon and horses. They laid the sacks on the wagon and traveled with the wagon and sacks about 30 or 40 miles, stopping to spend the night in a farmhouse. The following day he and his friend proceeded to Cham, Germany. At Cham, petitioner's friend decided to leave and go to Poland. Petitioner in some way obtained a cottage, either by renting or purchasing it, and stayed in Cham. He acquired some suitcases and placed the Reichsmarks he had found in the suitcases covered by some clothing and buried the suitcases in the cottage yard and covered them over with flowers. Prior to burying the Reichsmarks, he took some of them out *202 to live on. It is not clear from petitioner's testimony whether he kept all of the Reichsmarks that he and his friend found or whether they were divided with his friend. Petitioner went to work in Cham at a field hospital for displaced persons. He saw a notice of some kind asking for all people with some form of medical training to come and assist at the hospital and since he had a small amount of medical training in Poland before he became a Nazi prisoner, he went to help. Petitioner lived in Cham in the cottage he had acquired and worked at the hospital until September 1945 when he went to Erlangen, Germany, and entered medical school on a full-time basis. He testified that he made several trips between Cham and Erlangen to take the Reichsmarks which he had buried in the yard in Cham. In Erlangen he obtained living quarters in a building in which the local tax office was located and in the quarters he obtained there was a vault. He testified that he placed the Reichsmarks in the vault in his living quarters in Erlangen. In October 1945, he stated that he began to convert his Reichsmarks into American money through black market operations. Petitioner testified that he mostly made *203 his exchanges of Reichsmarks in varying transactions for $10 bills, but some of them were exchanged for $20 bills. He testified that he made the conversion at the rate of 50 to 100 Reichsmarks for a United States dollar. He stated that he made his purchases of United States currency for Reichsmarks in various places in Germany including in addition to Erlangen, Nuremburg, Munich, Frankfurt, and Heidelburg, and that he also exchanged some of them in Switzerland and in France. Petitioner testified that on June 20, 1948, when the Currency Reform Act went into effect, he had converted over one-half of the Reichsmarks he had found and brought with him 640 to Erlangen, Germany into American currency. He stated that thereafter he exchanged during the period from June 20 to June 26, 1948, all of his remaining Reichsmarks, except for one package which he had misplaced, for "D" Marks. He stated that he made the exchanges of the Reichsmarks for "D" Marks at various banks and that he did not remember filling out any form to make the exchange and that he did not have his identity card punched at any banks when he made the exchange. He stated that the one misplaced package of Reichsmarks which *204 he could not find prior to June 27, 1948, was worthless since he had not converted it prior to that date. After making the exchange of Reichsmarks for "D" Marks, petitioner exchanged "D" Marks for United States currency, mostly $10 and $20 bills. As petitioner would acquire a sizeable amount of $10 and $20 bills, he would exchange those bills mostly for $1,000 bills, but some for $500 bills, and would place these larger bills in his vault along with his unexchanged smaller bills and remaining German currency. Petitioner testified that when he came to the United States he had converted all but 10,000 of his "D" Marks into American currency and that he brought approximately $690,000 in mostly $1,000 bills but some in $500 bills, and 10,000 "D" Marks into the United States with him when he came. Petitioner testified that he kept the currency with him after he came to the United States until he rented a safe-deposit box in New York City where he placed the currency and kept it until he moved to Chicago and rented a safe-deposit box in Chicago. He testified that he rented the safe-deposit box in New York shortly after his arrival in this country. He testified he made several trips between *205 Chicago and New York, transferring the currency from New York to Chicago. Petitioner testified that he did not count the number of Reichsmarks he found and that he never counted the amount of American currency he had. He testified that he did not know how many Reichsmarks he had left at the end of 1945, 1946, 1947, or in June of 1948 at the time the Currency Reform Act went into effect. He testified that he did not know how many he had at the end of 1949 or 1950. He testified he did not know how many dollars or how much money in cash he had at December 31, 1951, 1952, 1953, 1954, 1955, 1956, or 1957. He read the amounts of cash on hand he had as of December 31, 1958, 1959, 1960, 1961, and 1962 from a memorandum that he said he had worked up in the few days preceding the trial. The story which petitioner told is so inherently improbable that for this reason alone we would not accept it. The black market rate of exchange was shown by the testimony of an expert who was eminently involved in developing the currency exchange act in Germany, and had investigations of black market rates of exchange made under his supervision, to be from 175 to well over 200 Reichsmarks to the dollar, *206 averaging around 200 Reichsmarks to the dollar for the entire period from September 1945 to June 20, 1948. Therefore, we find petitioner's statement that he consistently exchanged his Reichmarks for dollars at the rate of 50 to 100 and never more than 100 Reichsmarks to a dollar to be unbelievable. The evidence shows that the 138,000 of 1,000 Reichsmarks notes which petitioner would have had to find to make the exchange he claims to have made if he exchanged at the going black market rate of 200 Reichsmarks to the dollar, would weigh at least 480 pounds. Petitioner's testimony was, of course, that the sacks included 1,000 and 500 denominations of Reichsmarks, so assuming petitioner took all four sacks, the sacks would have had to weigh over 120 pounds each, and if petitioner took only two of the sacks they would have had to weigh over 240 pounds each, to have contained the number of Reichsmarks for petitioner to make the conversions he said he made. Petitioner's story about carrying these bags of Reichsmarks at this weight for the distances he claims to have carried them and concealing them in the manner he claims to have concealed them after having been on a forced prisoner march *207 for over 10 days is again inherently unbelievable. It is equally unbelievable that petitioner made the number of transactions he would have had to make to have obtained $690,000. To have obtained $690,000 in $10 denominations would have required 69,000 transactions. Assuming that a few of the transactions were in $20 bills, there would have had to be at least 60,000 separate transactions. In the approximately 2 years and 9 months in which petitioner stated he made the exchanges prior to converting his Reichsmarks into "D" marks, there would have been less than 1,000 days. If only one-half of the amount had been converted, this would have involved 30 641 transactions a day, exclusive of the exchange of $10 bills for $1,000 bills. Again, it is inherently unbelievable that petitioner could have negotiated 30 separate black market transactions a day while being a full-time medical student, being on trips, or working in full-time employment. Equally unbelievable is petitioner's testimony with respect to converting his Reichsmarks into "D" Marks. Not only was it established through respondent's expert witness that this could not have been accomplished in the manner petitioner testified *208 he made the exchange, but petitioner's own expert witness testified to the same effect when he stated that the Currency Reform Act of June 1948 in Germany was extremely successful. When the inherent impobability of petitioner's story is considered along with his inconsistent statement from time to time, either his inability or his refusal to explain how he knew the amount of the cash he had only at the dates important to the result in this case and his testimony in the criminal trial that he did not know how much money he brought into this country from Germany, we do not accept petitioner's testimony. Not only is petitioner's general testimony in this case conflicting as well as vague and at points evasive, but some of his specific testimony demonstrates his total disrespect for laws and regulations. Petitioner at one point stated that he knew it was unlawful to have foreign currency in Germany during the period from September 1945 until after the Currency Reform Act but that he nevertheless kept this foreign currency. When asked to explain how he could make the exchange of Reichsmarks for "D" Marks, petitioner stated: In fact, I was in Germany from 1945 to 1951. Of course, I was *209 outside Germany a bit, in Switzerland about five times, in France about nine times, in Italy about five times, in Denmark three times, but it makes no difference. I was in Germany continuously, and I can tell you only that the German people, the German students at my university, at List, I can tell you at my university they ignored orders or regulations given by the Germans because they said the whole order is a puppet order, is an order given by the American puppet government. In fact, and let me tell you one fact which is very - everybody who did live in Nuremburg, for example, when you passed by in the streetcar - at the time there was no - there were buses, too, but usually the streetcar, and when the streetcar passed by the building of the American Military Government, the conductor of the streetcar says by joke, "Who would like to go to the tall building, to a funny building," something like this. In German he said this. In other words, he meant who would like to go to a building which contains something which we ignore or which is fictitious. This is just a laughing when the streetcar passed by this building. This gives you the image how much the orders and laws had been respected *210 by the German people. Not only does the evidence show that in fact there were caches of German money and other valuables found abandoned by various people in various parts of Germany in the spring of 1945 just before the collapse of the Third Reich, but it also shows that this fact is mentioned in certain books and other well known published sources. Although the instances were rare in which one particular individual found a large sum, certain individuals who did find these sums are stated in published documents to have reported their find to the proper authorities. It is, of course, possible that petitioner did find some bags of Reichsmarks but since we cannot accept his testimony, we have no way of knowing whether in fact he did or did not. However, we think the evidence as a whole shows that petitioner did bring with him a substantial amount of money to the United States, and it is immaterial to this case how he acquired that money. The evidence shows that at one time he told a revenue agent investigating his returns that he had brought over $50,000 in United States and Germany currency with him when he came to the United States. The net worth statement as prepared by respondent *211 was on the assumption that petitioner did have approximately $50,000 in currency when he came into this country and that this was the source of his bank deposits and of the money for the purchases of stocks he made within the first 2 to 4 years after he entered this country. Both respondent and petitioner contend that the only income petitioner had in this country up to 1955 was the small payments he received as an intern or as a resident of the various hospitals and that not only did he pay the major portion of his living expenses during the period January 1951 through January 1955 from the sums he had brought into this country with him, but also established savings accounts in which he accumulated over $7,000 and bought stock at a cost of over $15,000. 642 Petitioner's net worth as of December 31, 1958, as computed by respondent is slightly in excess of $115,000. Respondent argues that the amount of this net worth in excess of the amount which petitioner had in stocks and in his savings accounts as of the beginning of 1955 might well have come from earnings not reported by petitioner during 1955 through 1958. He points out that in 1957 when petitioner was obtaining a mortgage *212 on the Pulaski Road property he stated that his income was in excess of $9,000 a year whereas petitioner had not during any of the years 1955 through 1958 reported on his income tax returns adjusted gross income in excess of the $4,214 which was the amount he reported in 1956. In support of this argument respondent points to the bank deposits made by petitioner during the period 1955 through 1958 totaling approximately $96,000. We do not consider it necessary to determine how much cash petitioner brought into this country. The crucial fact to be found in this case is what assets if any during the taxable years here in issue were acquired by petitioner with funds that came from a source other than taxable income of the current year. It would make no difference whether petitioner's cash on hand as of December 31, 1958 were $105 or $500,000, if that same amount of cash was on hand as of December 31, 1959, December 31, 1960, December 31, 1961, and December 31, 1962. Because of the burden to show error in respondent's computation being on petitioner and petitioner's having totally failed to show from any credible evidence the amount of cash he brought into this country and the amount *213 of that cash remaining on hand as of December 31, 1958, and as of December 31 of each of the years here in issue, respondent contends that we should sustain his determination on the basis of his net worth computation for failure of proof on the part of petitioner. However, after reviewing in detail all of the voluminous record in this case, we have concluded that there is evidence to indicate that petitioner did not have income in excess of approximately $58,000 in 1961 and $75,000 in 1962. We have therefore concluded that $60,000 of petitioner's increase in net worth in 1961 came from sources other than taxable income earned in that year and that $40,000 of petitioner's increase in net worth for the year 1962 came from sources other than income earned by petitioner in the year 1962. We have therefore found that petitioner had at least $100,105 of cash other than in banks or savings associations on hand as of December 31, 1958, December 31, 1959, and December 31, 1960, and that he had remaining of this cash on hand $40,105 as of December 31, 1961, and only $105 of this cash on hand remaining as of December 31, 1962. We have reached this conclusion based on all the evidence of record *214 including the fact that Libert's testimony at the trial in which petitioner sued Libert for an injunction, which testimony was stipulated into this record to be accepted as if the testimony had been taken at this trial; showed the gross receipts potential of the Garfield Ridge Medical Center as operated by Libert to be at least $145,000 a year. Although there is no direct testimony of the expenses of operating this Center, there are indications that the operation was very profitable. If these expenses, including not only medicinals and other supplies purchased but salaries of certain other doctors and assisting personnel, ran in the vicinity of about one-half the gross receipts, an amount suggested by petitioner in his reply brief, the net monthly income from the Garfield Ridge Medical Center as operated by Libert would appear to be about $6,000. While there is an indication from the evidence that the income would run around $6,000 a month from the Center if petitioner operated it as efficiently as did Libert, the indication from the record is that petitioner did not have as much income from the Center as Libert had. The evidence indicates that from the time petitioner took over the *215 Center in mid-August until about April 1962, he did operate the Center with approximately the same number of patients and approximately the same income as Libert had been obtaining, but that after April 1962 the number of patients began to decline. Using as a rough estimate $6,000 a month income from the Medical Center, petitioner would have received in 1961 approximately $27,000 of income from the Garfield Ridge Medical Center. In the 2 prior years petitioner's income as computed by respondent on the increase in net worth basis was approximately $29,000 for 1959 and $26,260 for 1960. It is stipulated that in 1960 petitioner had interest income of $2,883.24 and dividend income of $2,867, making a total income aside from earnings of $5,750.24. Therefore, in 1960 petitioner's income from his medical practice at Pulaski Road must have been about 643 $20,500. It would be unlikely that petitioner's income from the Pulaski Road practice in 1961 would run much more than in 1960 since the evidence tends to show that the Pulaski Road practice began to fall off and continued to somewhat decrease after petitioner took over the Garfield Ridge Medical Center. In 1961 petitioner had interest *216 income of $2,655.02, dividend income of $5,495.54 and rental income of $1,540. Adding this income to a reasonable amount of likely income of petitioner for the year 1961 from his Pulaski Road and Garfield Medical Center practices, the result is approximately $58,000. Other support for the fact that some of petitioner's assets in 1961 must have been acquired from nontaxable sources is shown by the fact that during the first 2 months of 1961 petitioner purchased stock at a cost of $19,476.03. It is shown by his purchases of accommodation checks that there were no withdrawals from his savings or checking accounts for the purchase of these stocks. It would therefore follow that petitioner either had to purchase these stocks from currently taken-in income or from a source other than income. Since petitioner had not taken over the Garfield Ridge Medical Center during the first part of 1961, on the basis of this record, we see no source of current income during these 2 months in excess of between $4,000 and $5,000. It would therefore follow that between $14,500 and $15,000 of these funds came from a nontaxable source. In the following 2 months, March and April of 1961, petitioner purchased *217 $37,416.33 worth of stocks with funds not taken from a checking or savings account. In our analysis of any likely source of income for petitioner, there was no likely source in excess of somewhere between $6,000 and $7,500. It would therefore follow that from $30,000 to $32,000 of the funds with which these stocks were purchased came from nontaxable sources. In the months of May and June petitioner purchased with funds other than amounts taken from his checking or savings accounts $19,778.56 worth of stock. Again, there is no likely source of income of petitioner in these 2 months in excess of $6,000 to $7,500 which means that between $12,000 and $14,000 of the amounts used to purchase this stock came from nontaxable sources. Only one purchase of stock was made by petitioner after June 20, 1961, and that was a purchase on July 31, 1961, of stock at a cost of $1,331.94. This purchase might well have come from petitioner's current earnings. In August 1961, after petitioner acquired the Garfield Ridge Medical Center, he had available a likely source of far higher amounts of income. There is in the record in this case all the details of the dates on which petitioner entered his safe-deposit *218 boxes at Talman Federal Savings and Loan Association in Chicago, Illinois. Quite a number of these dates in the first 6 months of 1961 coincide with the dates petitioner purchased accommodation checks which were negotiated by brokerage firms and were in the exact amount of the cost of stock he purchased. Again, this might be some indication that the funds with which these checks were purchased came from money in a safe-deposit box. Considering all of this evidence, we have concluded that $60,000 of petitioner's increase in net worth in 1961 came from a source other than taxable income of that year. In 1962 the evidence would indicate that petitioner would have net income from the Garfield Ridge Medical Center of approximately $24,000 from January through April. There is less indication of the income petitioner might have had from this Center for the following 8 months. However, since it was not until after the year 1962 that Libert opened an office anywhere near the Garfield Ridge Medical Center and the record is clear that petitioner continued to keep as patients the employees of many business and industrial firms that had been using the Garfield Ridge Medical Center for medical *219 services, in our view, considering all of the evidence and particularly the testimony stipulated in this record which was taken in connection with petitioner's action to enjoin Libert from practicing medicine from the office on South Archer Avenue, petitioner should have received approximately $55,000 of net income from the practice at the Garfield Ridge Medical Center in 1962. It is stipulated that petitioner received interest income of $2,272.25 in 1962. Petitioner received dividend income in this year of $6,945.68 and rental income of $3,870. Therefore, in addition to the $55,000 from the Garfield Ridge Medical Center, petitioner received approximately $13,000 of interest, dividend and rental income, making a total of $68,000. Both parties agree that in 1962 petitioner's practice at the Pulaski Road address was greatly reduced over what it had been 644 in previous years. Although there is no clear indication of the amount of reduction the indication is that that practice would have been less than one-half what it was prior to petitioner's acquisition of the Garfield Ridge Medical Center. Therefore, if petitioner earned approximately $7,000 net income at the Pulaski Road *220 address and approximately $55,000 at the Garfield Ridge Medical Center, and this was added to approximately $13,000 of other income, the result would be approximately $75,000 of total taxable income for the year 1962. This would mean that approximately $40,000 of petitioner's increase in net worth for the year 1962 would of necessity come from funds from a nontaxable source. There is also other evidence in the record to support the fact that some of petitioner's increase in net worth was from a nontaxable source in 1962. On January 3, 1962, petitioner made a payment of $5,000 on his indebtedness to Drovers National Bank and on that same date made a payment to Libert of $2,500 and 5 days later on January 8, 1962, made a cash deposit in the Drovers National Bank of $4,500. None of these amounts is explainable by withdrawals by petitioner from savings or checking accounts or sale of any previously owned assets. Although petitioner may have been taking in over $12,000 a month at the Garfield Ridge Medical Center and additional sums from his practice on Pulaski Road, there seems no available source during the first 8 days of 1962 for total cash receipts by petitioner of $12,000 from taxable *221 income sources. The evidence also shows that during the year 1962 petitioner made total deposits in his two checking accounts at the Drovers National Bank of approximately $210,000 other than deposits of proceeds of loans whereas the other testimony of record would show available sources of funds to be deposited from income sources of not over approximately $170,000. While the evidence for the year 1962 is not as strongly indicative that some of petitioner's increase in net worth came from sources other than taxable income as is the evidence in 1961, in our view, considering the evidence as a whole, it does support by a preponderance the conclusion that at least $40,000 of the increase in petitioner's net worth came from sources other than taxable income. Whether petitioner had cash remaining in a safe-deposit box at December 31, 1962, or whether he had cash remaining at that time which had been in the box as of December 31, 1958, we need not decide. In our view, the only manner by which petitioner has established any assets in addition to those determined by respondent is the inference to be drawn from documentary evidence and testimony by Libert and various employees of the Garfield *222 Ridge Medical Center with respect to the potential earning capacity of that operation. This evidence indicates that when petitioner's income from that source and other likely sources are combined, petitioner's total taxable income for 1961 and 1962 could not reasonably have exceeded approximately $58,000 and $75,000, respectively. We therefore sustain respondent's determination of deficiencies and additions to taxes, except to the extent that respondent's determination of petitioner's taxable income for the year 1961 should be reduced by $60,000 and for the year 1962 by $40,000. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Coce of 1954.↩
2. Apparently, there is a mathematical error of $10 in petitioner's computation of his adjusted gross income.↩
3. The $1,525 reported by petitioner included $225 as received from Talman Federal Savings and Loan Association, whereas petitioner's actual receipts from that institution in 1962 were $145.75. Petitioner reported as received from Trident Savings and Loan Association the amount of $425 and the same amount as received from Crawford Savings and Loan, whereas in fact he received $450 from each of those institutions in 1962.↩
4. The total of these accounts are stipulated and the balances as of the dates involved in respondent's net worth computation are not in issue. Therefore, from our inclusion of the facts as stipulated, we consider the amounts deposited to these various accounts to be as so stipulated. We will only make specific findings of amounts of deposits or other facts with respect to these accounts where we think it necessary to an understanding of our holding in the case.↩
5. The approval date of this account is January 2, 1953. However, the parties stipulated, as stated in this sentence, that the account was opened in 1952.↩
1. Gain on the sale of the Unexcelled Chemical stock was $16.14. ↩
2. Gain on the sale of the Schick Inc. stock was $21.36.↩
6. There is no controversy with respect to depreciation reserves as of the various years on automobiles, turniture and fixtures at 5625 South Pulaski Road and the amounts as determined by respondent will be incorporated in a statement of petitioner's assets and liabilities hereinafter set forth.↩
7. All the details of petitioner's entries into his various safe deposit boxes are stipulated and have been found as stipulated. We only include herein those facts with respect to those entries of safe-deposit boxes which have a bearing on our conclusions in this case.↩
8. Sec. 6501(c)(1) provides as follows: (1) False return. - In the case of a false or fraudulent return with intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩